The ANSON CORPORATION, Appellant,

v.

The CORPORATION COMMISSION OF the STATE OF OKLAHOMA and Roy Reed Trusts Partnership, Appellees.

No. 77656.

Court of Appeals of Oklahoma, Division No. 3.

March 31, 1992.

As Modified on Limited Grant of Rehearing May 12, 1992.

Certiorari Denied Oct. 13, 1992.

Gordon D. Ryan, Sharon Taylor Thomas, Oklahoma City, for appellant.

David E. Pepper, Brinda K. White, Oklahoma City, for appellees.

## OPINION

JONES, Judge:

Anson appeals Order No. 351488 of the Corporation Commission dated May 2, 1991. The Commission En Banc affirmed the Appellate Administrative Law Judge whose opinion was filed on February 6, 1991. In that opinion, the appellate judge reversed the decision of the Administrative Law Judge. We vacate the Commission's Order and reinstate the decision of the Administrative Law Judge which was filed on December 31, 1990.

On March 14, 1990, Anson filed its application to force pool a 640–acre drilling and spacing unit in Section 21, Township 5 North, Range 23 East, LeFlore County, Oklahoma. Appellee, The Roy Reed Trusts Partnership, owned 11.25 net mineral acres in the unit. On the same day of Anson's application, Reed executed an oil and gas lease (the first lease) giving a ⅛th royalty interest in the 11.25 mineral acres to Poor Boy Oil Company. The Poor Boy lease was not filed of record until April 18, 1990. Anson's forced pooling application was heard on May 23, 1990.

On June 28, 1990, the Commission issued Pooling Order No. 348269 which was filed on July 3, 1990. Anson was made operator

of the well and certain options were provided to the mineral owners. The mineral owners could elect to receive either (1) a $750.00 per acre cash bonus, plus an overriding or excess royalty of $1/16$ of $8/8$ in addition to the standard $1/8$ royalty interest, or (2) an excess royalty of $1/8$ of $8/8$ in addition to the standard $1/8$ royalty. If the first option was chosen, the mineral owner must deliver an 81.25% net revenue interest to the operator. Under the second option, the mineral owner would deliver only a 75% net revenue interest to the operator.

In its letter to Anson dated July 12, 1990, Reed attempted to split its election. The question of whether a split election was permissible is not important, but the question of whether Reed could properly elect to receive the cash bonus is critical. The option to elect a cash bonus was not available to Reed because its interest was burdened by the first lease to Poor Boy. However, unknown to Anson, Reed had executed a second lease to Poor Boy on July 6, 1990, which purported to remove the burden of Reed's mineral interest by reducing Poor Boy's interest from $1/8$th to $3/16$ths. The amendatory lease was signed on July 6, 1990, but was not filed of record until October 31, 1990, after the well was determined to be dry. Although Reed could have proved its right to elect the cash bonus by presenting the lease, it chose not to do so. Anson became aware of the amendatory lease in November, 1990, after the courthouse records were checked.

On October 11, 1990, Reed filed an application in Cause CD No. 157458 requesting the Commission enter an order to clarify and interpret Order No. 348269 to determine that the plan of development, established thereunder, provided for elections to be split between participation and other options available, and also to determine that the cash bonus election made by the Roy Reed Trusts Partnership was proper. In its application, Reed did not present the second lease as evidence.

The Administrative Law Judge clarified Order No. 348269 and found that the election made by The Roy Reed Trusts Part-

nership to elect the cash bonus option was not proper. The report stated:

[T]he evidence presented here was very clear that the Roy Reed Trusts Partnership created Poor Boy Oil Company not as a separate entity but simply as a manner of playing a shell game with interests when it was needed to benefit the trust. By the Trust's own admission it had transferred an interest to Poor Boy Oil Company in order to prevent its lease to Mobil from vesting. Thus, the Trust actively was involved in moving its interests around for its own benefit.... Anson therefore was entitled to rely upon the public records in order to determine the interests held by the Trust or Poor Boy Oil Company. That Anson did not actively seek to obtain information from the Trust after August 15th, does not reflect badly upon Anson. At the time the Trust made its election up to October 31st, Anson was of the belief that Trust was incapable of delivering a $3/16$th [sic] total royalty. The Trust did not do anything to advise Anson differently.... Anson had made a diligent effort to determine the Trust's interest and should not be penalized for the Trust's ... game playing. Therefore, the order should be clarified to show that the applicant's [Reed] election was not proper. R.138.

The Appellate Administrative Law Judge reversed, reasoning that "Anson's decision to rely on county records does not affect the interest that Poor Boy held". We do not dispute the correctness of that statement, but it does not address the real issues. If Poor Boy had been an actual disinterested party with an unrecorded interest, the interest would have been enforceable between the parties, but not against Anson. The appellate judge further stated that "there is no law in Oklahoma requiring that a document transferring an interest be recorded before it is valid between the parties." Again, that is certainly a correct assessment of the law, but we are clearly dealing with the rights of third parties in this case, and not just the immediate parties.

■ Perhaps an analogy to the division order process can serve to clarify the issue. In making payments from production runs to royalty and working interest owners under the terms of a division order, an oil and gas purchaser must rely on the information contained in the document. Even though the fractional interest of each owner is listed on the division order, owners may assign portions of their interests to other parties after the division order is issued. A division order may be amended only upon presentation of a recorded instrument affecting the interests therein. Such assignments are valid between the parties even if they are not recorded, but the purchaser is not required to make payments directly to any interest owner who is not listed on the division order. The rights and obligations which exist between the assignor and the assignee do not affect the rights of third parties unless the applicable instrument is recorded. Similarly, a recorded real estate mortgage generally takes precedent over a prior unrecorded mortgage.

■ Recording is not necessary to the validity of any deed, mortgage, or contract relating to real estate to establish validity between the parties. 16 O.S. 1910, § 15. However, no deed, mortgage, contract, bond, lease, or other instrument relating to real estate shall be valid against third persons unless acknowledged and recorded. Id. An oil and gas lease is not, per se, real property, but it does create an interest in real property *Amarex v. El Paso Natural Gas Co.*, 772 P.2d 905, 908 (Okl.1987) and many of the laws of real property apply. Third persons traditionally rely upon land records for information regarding interests in land. Id.

The Court in *Davis v. Lewis*, 187 Okl. 91, 100 P.2d 994 (1940) concluded that oil and gas leases are "instruments relating to real estate" as within the meaning of the statute. *Davis* 100 P.2d at 996. The leases in *Davis* were required to be acknowledged and recorded. The Court reasoned the instruments related to and affected real estate because the fund was to come from minerals extracted from the real estate, and it affected the real estate in many respects. *Davis* at 997. The Court further held that non-recorded instruments are invalid as to subsequent purchasers in good faith, for value and without notice. Id. at 997.

In an attempt to support its contention that Anson is not a bona fide purchaser, Reed offers *Whitehead v. Garrett*, 199 Okl. 278, 185 P.2d 686 (1947), but that case involved the question of whether a tax title is dependent upon an unrecorded deed. It is therefore not applicable to the case at bar. The Court in *Barker v. British American Oil Producing Company*, 208 Okl. 426, 256 P.2d 807 (1953) held that a lessee of real estate for oil and gas can be a bona fide purchaser if it is without actual or constructive notice that an unrecorded conveyance to another party exists. Id. The issue of notice is important in this case because an unrecorded lease may be valid against third parties if they have knowledge or notice of its existence. The record in the instant case reveals that Reed did not provide a copy of the unrecorded lease to Anson, even though it could have done so at any time. Further, Anson did everything possible to determined whether any subsequent lease assignments had been filed of record even though the law does not require an applicant before the Corporation Commission to check the records daily up to the time of hearing. *Chancellor v. Tenneco Oil Co.*, 653 P.2d 204 (Okl.1982).

Furthermore, Anson was not placed on inquiry notice to discover the existence of the July 6, 1990, lease. In its letter dated August 15, 1990, Reed said only that Poor Boy was a subsidiary and "we can deliver" an 81.25% net revenue interest implying that together, the two entities owned 100% of the lease. Reed's bare assertion that it could deliver the required net revenue interest did not provide notice of the unrecorded lease to Anson. There was not even a suggestion that the amendatory lease existed. If Reed were playing by the rules, that lease would have been attached to the letter. See *Tenneco Oil Company v. Humble Oil & Refining Company*, 449 P.2d 264 (Okl.1969).

Contrary to Reed's assertions, third parties are definitely affected by attempts to circumvent pooling orders. The reason that leases must be recorded to achieve validity against third parties is apparent. The operator of an oil and gas well provides administrative and managerial services and is bound to pay for labor and services provided under contract to develop the lease. *Amarex v. El Paso Natural Gas Co.*, 772 P.2d 905 (Okl.1987). The operator is thus under a duty to the interest owners to manage funds properly and to make managerial decisions based on recorded documentation. The court's discussion of the detrimental effect of "secret liens" on third parties may be effectively analogized to the facts in the instant case. Oil and gas leases must be filed of record before they can affect the rights of third parties. Anson, in its fiduciary capacity, is such a third party.

Due to the inherently risky nature of oil and gas exploration, coupled with the great need for advance funding, incentives must be provided to investors and mineral owners. The interests of those individuals who play by the rules are detrimentally affected when other parties are allowed to manipulate the law to achieve a greater return with no risk. The long term effect could be a greater reluctance on the part of honest investors to participate in drilling funds and a larger number of lessors who always elect to take the bonus. The only remaining investors would be the "sophisticated" ones who find ways to circumvent the pooling order. The Commission's Order thus has the long term effect of diminishing drilling funds for the entire industry.

The record shows that Reed secreted the amendatory lease and waited for the well to be completed. When the well proved to be dry, Reed filed the lease to show that it could indeed elect the cash bonus. If the well had been a good producer, then the lease could have been discarded and Reed would have received payments from the production runs. Although Reed made an amended lease before attempting to elect its options under the pooling order, it chose not to tell anyone about it or to file it of record until months after the rights under the pooling order had vested, and after the well was determined to be dry. In essence, we agree with the Administrative Law Judge and reinstate her findings.

Absent an assertion of a violation of a constitutional right, this Court's review is confined to a determination of whether the Commission exceeded its authority, and whether the findings of the Commission are sustained by the law and by substantial evidence. *Inexco Oil Company v. Oklahoma Corporation Commission*, 767 P.2d 404 (Okl.1988). It is clear from the record in the instant case that Order No. 356579 of the Corporation Commission is not sustained by the law nor is it supported by substantial evidence.

ORDER VACATED, CAUSE REMANDED to the Corporation Commission for the purpose of entering an order consistent with this Court's Opinion.

HANSEN, V.C.J., and HUNTER, J., concur.